## D. W. ACKER *et al.* v. JAMES S. WARDEN.

NOTE— *Consideration—No Fraud to Bar Recovery.* Where a surety was induced to renew a note upon the representation of the payee that the consideration of the original note was for money paid to the principal maker over the counter of a bank by the payee, when in fact the consideration was for money paid by the payee for the benefit of the principal maker to another party for the purchase-price of an interest in a patent-right, *held,* that no such fraud or deceit is shown as to bar the recovery on the note by the the payee against the surety.

### *Error from Marshall District Court.*

ON the 23d day of July, 1883, *D. W. Acker* and *J. F. Watson* brought their action against *James S. Warden,* to recover as damages $3,000. In their petition they alleged that

one W. H. Gibbs was the owner of a patent-right for the state of Kansas of an improvement in a dairy churn, originally issued to W. W. Sanborn, of Clinton county, Iowa; that Warden induced Frank W. Alvord, on September 21, 1880, to purchase the undivided one-half interest in the patent from W. H. Gibbs, for the state of Kansas, excepting certain counties; that he induced Alvord to execute his promissory note therefor in the sum of $500, and also induced the plaintiffs to sign the same as sureties; that Warden then and there promised he would buy the remaining undivided one-half interest in the patent-right for $1,000, and would pay that sum for the same; that the representations of Warden about buying the undivided one-half interest for $1,000 were wholly false, and known to him to be false; that W. H. Gibbs, without any consideration, on the 17th day of September, 1880, conveyed to Warden the undivided one-half interest in the patent-right; that the conveyance was made solely for the purpose of cheating and deceiving these plaintiffs as to the value of the patent-right, and as to the amount that Warden was to pay therefor. They further alleged in their petition, that on September 21, 1880, the date of the execution of the note of $500 by Alvord and themselves, Warden represented to Alvord that the patent-right was a new, novel and useful invention, and an improvement of great value; that large sums of money could be made from the sale thereof; but that in fact the patent-right was utterly worthless and of no value whatever, and possessed neither novelty nor utility, and that Warden well knew this at the time he made all the foregoing representations, and so induced Alvord and these plaintiffs to sign and deliver the note of $500 on September 21, 1880. The petition also alleged that, on the 28th day of November, 1881, Warden induced the plaintiffs to execute a renewal of the note, upon the statement that Alvord had borrowed $500, and that the first note had been executed for that amount of money, which he had paid to Alvord over the counter of his bank; that all of these representations were false, and known by Warden to be false, at the time they were made; that

Warden assigned and sold the note to the Exchange National Bank, of Atchison, in this state; and that, on the 18th of July, 1883, a judgment was rendered in favor of the bank and against them as principals on the note, for the sum of $532.50, which they will have to pay.

The defendant, James S. Warden, in his answer denied generally the averments of the petition, and alleged that he did not assign or transfer the second note until after its maturity, and that, in an action brought by the bank upon the note, judgment was recovered against the plaintiffs upon personal service, and that therefore the plaintiffs have no cause of action whatever against him. The plaintiffs filed a reply, denying that the promissory note described in their petition was assigned, transferred or sold to the Exchange National Bank, of Atchison, before it became due. Trial had on the 2d day of September, 1885, before the court with a jury. After plaintiffs had introduced all of their evidence, the trial court sustained a demurrer filed thereto by the defendant, and rendered judgment for costs in favor of the defendant and against the plaintiffs. The plaintiffs excepted and bring the case here.

*W. A. Calderhead*, for plaintiffs in error.

The opinion of the court was delivered by

Horton, C. J.: The material facts in this case are as follows: W. W. Sanborn, of Iowa, obtained on the 21st day of May, 1867, letters-patent from the United States for certain improvements in dairy churns. Prior to 1880, the right to sell and use this patent in Kansas was purchased by W. H. Gibbs. In September, 1880, Alfred Hill and Frank W. Alvord purchased of Gibbs an undivided half of the patent-right for the state of Kansas, excepting a few counties, for $1,000, and James S. Warden purchased the other undivided half for $500. In paying for his undivided quarter, Alvord executed his note of $500 to James S. Warden, dated September 21, 1880, and due 120 days after date, bearing 12 per cent. interest after maturity. J. F. Watson and D. W. Acker

signed this note as sureties for Alvord. When the note became due it was not paid, and on November 28, 1881, the note was renewed by Watson and Acker, payable eight months after date. George C. Brownell also signed this note. Subsequently, the note was sold and indorsed by James S. Warden to the Exchange National Bank, of Atchison. On the 16th day of March, 1883, the Exchange Bank brought its action against Watson, Acker, Brownell and Warden upon this note, and, upon personal service, obtained judgment against all the parties. On the 23d of July, 1883, this action was commenced by Acker and Watson against Warden for damages, alleging fraud and deceit on the part of Warden in procuring both of these notes referred to. Upon the trial, after the plaintiffs had introduced all of their evidence, the defendant interposed a demurrer thereto, which was sustained by the court. The plaintiffs excepted, and bring the case here for review.

It is claimed that Acker and Watson were induced to sign the note of Alvord to Warden of $500 on September 21, 1880, by the false representations of Warden. They claim that he promised to purchase and pay $1,000 for an undivided half of the patent-right; second, that he represented that the sale of the patent-right for two counties in Kansas had been made, which would nearly pay the note; and, third, that he stated the patent-right was valuable and useful, when it was worthless and of no value whatever. It is also claimed that the evidence shows that Warden purchased the patent-right for Kansas on September 17, 1880, prior to the time that Alvord executed any note, or had purchased any part thereof. It appears, from the evidence produced upon the trial, that Warden never had any conversation with Acker and Watson prior to their signing the note of September 21, 1880; therefore he did not personally by any representations or promises induce them to become the sureties of Alvord. Alvord made some such representations to Acker and Watson, which he said Warden had made to him, and it appears that Warden did make some such statements to Alvord. It is clearly appar-

ent, however, from Alvord's own statements, that the pretended sales of the patent-right, prior to his purchase, were not relied upon by Alvord, because he cannot remember the amount; and his other evidence shows that he was eager to make the purchase of a quarter interest in the patent-right, if he could raise the purchase-price, or could give a good note therefor. It is evident that Alvord, after a short examination of the dairy churn in operation, and his conversation with Warden, was induced to believe that the patent-right was a valuable one, and that, if properly operated, he could make money out of it. He also was induced to buy an interest in the patent-right because he thought that Warden was a first-class business man and would not take an interest if the patent was not all right. The amount that Warden was to pay for an undivided half was not so important to Alvord as the fact that Warden thought the patent-right of so much value as to become interested therein and the owner of an undivided half thereof. Alvord testified, among other things, as follows:

"Ques. How long were you engaged in examining the patent churn? Ans. Why, not a great while. I think at the time I first saw it he was in the act of churning.

"Q. You thought it was a pretty good thing? A. Yes, sir.

"Q. And made up your mind, as I understand you to say, that you would take an interest in it if you could put up your part of the money or the security? A. Yes, sir.

"Q. Did you have considerable talk with Mr. Gibbs about the operation of the churn? A. Not a great deal; no. I had a considerable talk with him as to dealing in patent-rights.

"Q. Did you see the churn operate yourself there at the fair grounds? A. Yes, sir.

"Q. You saw, then, that you believed it was capable of going? A. Yes, sir.

"Q. And you, in the exercise of your own good judgment, thought it was a pretty good thing at that time? A. Yes, sir.

"Q. And after that you had a talk with Warden, I understand you, and he told you to get security on this note for $500, subsequent to that time? A. Yes, sir.

"Q. Now, at the time you spoke to Acker and Watson, had they any knowledge about your purchasing this patent-right, so far as you knew? A. Yes, I think they had.

"Q. Previous to that time? A. Yes, I think they did.

"Q. They knew what this note was for? A. Yes.

"Q. They knew that you had given this note for an interest in this patent-right? A. Yes, sir. ·

"Q. You explained to them fully what you wanted it for, and asked them to go your security? A. Yes, sir.

"Q. They had no interest in the patent-right themselves? A. No, sir.

"Q. They were simply accommodating you by indorsing your note? A. Yes, sir.

"Q. That was the way you understood it? A. That was the understanding.

"Q. And I understand you to say that Mr. Warden was not present when they signed this note? A. No, sir; he was not.

"Q. They signed this note upon your request and upon your solicitation alone? A. Yes, sir.

"Q. After these papers were fixed up you started out to sell these patent-rights? A. Yes, sir.

"Q. You sold how many rights? A. I sold two.

"Q. What did you receive for them? A. I received $160 for one right, and I traded the right of Clay county for a man's interest in a timber claim.

"Q. Did you afterward sell the timber claim? A. No, sir; I traded him, besides, a horse or pony that I had.

"Q. What was the timber claim worth? A. Well, I don't know.

"Q. You got $160 in money for the other? A. I couldn't have got anything for it, I suppose; I tried to.

"Q. You abandoned it, did you? A. Yes, sir.

"Q. Did you make any other sales? A. No, sir.

"Q. Was that the money you realized? A. That was all the money I realized.

"Q. And at Valley Falls, after you had attempted to manufacture this churn unsuccessfully, you threw up the business? A. Yes, sir.

"Q. Subsequent to that, you and Acker and Watson were sued on the note, were you not, in this court? A. I believe we were."

The evidence of W. H. Gibbs shows that he sold the patent-right to Hill, Alvord, and Warden; that an undivided half was for Hill and Alvord, and the other undivided half for Warden; that Warden advanced the money for the undivided half purchase by Hill and Alvord, less the discount,

and that Warden paid the balance of the $1,500 for which the whole patent-right was sold for Kansas, excepting a few counties. His evidence also shows that the patent-right purchased by Hill, Alvord and Warden is a good and useful invention, and in skillful hands works well. All of the evidence tends to show that Warden believed the patent-right a valuable one, and also believed, at the time he associated with him Hill and Alvord in the purchase of it, that money could be made in the sale of the patent-right in Kansas. There is no evidence showing or tending to show that Warden ever supposed or believed that the patent-right was worthless. It did not appear upon the trial that either Acker or Watson was induced to sign the first note by the fraud or deceit of Warden. The renewal, or second note, which was given to take up the first note, was executed long after all the foregoing facts were known to Alvord and Watson, and the only false statement which is alleged against Warden concerning the execution of the second note is the statement or representation that Alvord got $500 from him at his bank on the first note. The evidence shows that the amount of this note, less discount, was turned over by Warden to Gibbs; and, although Alvord did not in person obtain $500 at the counter of Warden's bank, yet the $500, less discount, in money was actually paid to Gibbs by Warden for the benefit of Alvord. Warden may have made some statements in the matter which were not wholly true, but it is not every false statement that is actionable. It is immaterial whether Warden had paid to Alvord at his bank counter the $500, or had paid it to Gibbs for Alvord. (*In re Cameron*, 44 Kas. 64.) As Gibbs sold the patent-right for $1,500, it is possible that Alvord paid more than he ought to have paid for an undivided quarter, or that, on account of the payment of $500, he is entitled to a larger share than an undivided quarter of the patent-right; but no such fraud or deceit is shown as to entitle the plaintiff to recover upon the testimony disclosed.

The judgment of the district court will be affirmed.

All the Justices concurring.